# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

AMY BERMUDEZ,

    Plaintiff,

v.

CITY OF TOPEKA, KANSAS,

    Defendant.

Case No. 5:18-CV-4141-HLT-ADM

## MEMORANDUM AND ORDER

Plaintiff Amy Bermudez sued her former employer, the City of Topeka, for gender discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and the Kansas Act Against Discrimination ("KAAD"), K.S.A. §§ 44-1001, et seq. Bermudez claims that she was constructively discharged by the Topeka Fire Department ("TFD") when an allegedly intolerable and hostile work environment forced her to resign. The City moves for summary judgment on all claims and seeks to limit Bermudez to events that occurred within 300 days of, and were included in, her EEOC complaint. Doc. 47. For the following reasons, the Court grants the City's motion for summary judgment.

## I.    BACKGROUND

The TFD hired Bermudez as a firefighter in 1992. As a firefighter, Bermudez was in a "suppression" position, meaning her duties included going to and putting out fires. Doc. 48 at 1. In 1999, Bermudez's title was Fire Inspector I. By the time she left the TFD in 2017, she was a Fire Inspector III. *Id.* A fire inspector is a "specialty" or "prevention" position at the TFD. Her duties included inspecting buildings and fire-code compliance. *Id.* at 2. As a fire inspector, Bermudez reported to the fire marshal, Michael Martin. Martin became the fire marshal in 2014. *Id.* Bermudez did not believe Martin was qualified to be fire marshal because he relied on her to

help him carry out his job responsibilities. *Id.* at 2-3. In 2014, Bermudez filed an EEOC charge regarding the TFD's failure to promote her to fire marshal. Doc. 56 at 16. Following that complaint, Bermudez alleges that Martin mistreated her. Specifically, Bermudez alleges that Martin:

- did not tell her about decisions announced at meetings in March and April 2014, *id.* at 17;

- sent her some emails between April 21 through May 12, 2014, about how she entered her lunch times in the TFD's new time-clock system, which she viewed as "badgering," *id.*;

- did not inform her about or send her to certain training classes, *id*. at 16-17;

- in May 2014, asked another inspector to bring him a Knox Box access key for a property that was in Bermudez's territory, *id.* at 17-18;

- in May 2014, did not forward her an email related a task force Bermudez was on, *id.* at 18;

- requested and approved plans for a Tough Mudder obstacle course in April and May 2014, even though Martin had assigned Bermudez to do the permitting for the event, *id.*;

- in May 2014, asked Bermudez three times when an inspection was scheduled and when it would be completed, and then allegedly "responded harshly" to Bermudez's answer, *id.*;

- did not inform her that a training class she was scheduled to attend in May 2014 was canceled, *id.*;

- failed to forward a request for a Knox Box key to Bermudez on May 21, 2014, which caused her "professional embarrassment," *id.* at 18-19;

- assigned Bermudez to inspect a property on May 27, 2014, instead of another inspector even though Bermudez was busier, and then asked when the inspection was scheduled and when it was completed, which Bermudez viewed as micromanaging, *id.* at 19;

- in May 2014, reassigned facilities that were outside Bermudez's territory, but that she normally inspected, to other inspectors, *id.*;

- wore his gun to work on three occasions in June 2014, *id.*;

- communicated with Bermudez through other employees after July 2014, *id.* at 19-20; and

2

- submitted Bermudez's timecards without authorization or corrected them several times in 2014, and on two occasions in July 2014, did not do Bermudez's "punches" as she had requested, *id.* at 20.

All of these actions took place in 2014. Bermudez has not included any allegations about any actions taken against her in 2015 or 2016.

In January 2017, Bermudez inspected St. Gregory Suites, which is managed by Lew McGinnis. Doc. 48 at 6. McGinnis later complained to Martin that Bermudez acted rude and angry and yelled during the inspection. *Id.* at 6-7. Although it is not clear when McGinnis made the verbal complaint to Martin, at some point after, Martin asked McGinnis to submit his complaint in writing. *Id.* at 7. Martin also told McGinnis that, although Bermudez can be "curt" at times, fire safety is taken very seriously. *Id.* Although Bermudez admitted she can be "direct and blunt" at times, she considered it harassment that Martin told McGinnis that she can be "curt." *Id.* Another inspector was later reassigned to inspect McGinnis's property. *Id.*

Martin generally reviewed Bermudez favorably, and her last evaluation at the TFD was "exceeds expectations" in February 2017. *Id.* at 2. Although Bermudez was not aware of what ratings other fire inspectors received, she believed, based on her observations, that they did not deserve as high a rating as she did. *Id.* Bermudez returned her evaluation in early March 2017 with an attachment that criticized the evaluation process. *Id.* The document alleged that Bermudez had been "increasingly shut out for voicing opposing opinions and labeled as not being a team player." Doc. 48-13 at 35. Bermudez further alleged that promotional and hiring decisions are "prioritized first by their Union affiliation, nepotism, cronyism- [sic] drinking buddies, fishing buddies, hunting buddies and other sports activities, and then by people who are easily swayed and who will compromise their integrity for the agenda of the promoter." *Id.* But it did not specifically allege gender discrimination. *See id.*

3

In March 2017, the owner of the Best Western Topeka Inn and Suites complained to Martin that Bermudez had made racist remarks about Best Western's staff. Doc. 48 at 8. The complaint was made on the owner's own initiative, and the owner requested that a new inspector be assigned. *Id.* at 8-9. A subsequent investigation by the City of the Best Western complaint did not substantiate any discrimination by Bermudez. *Id.* at 9-10. Bermudez was not disciplined for either the St. Gregory or Best Western incidents. *Id.* at 9. She has not been demoted, passed over for a promotion, put on probation, given a performance improvement plan, had her pay reduced, or been assigned to significantly different duties since February 2014, when Martin was promoted over her. *Id.* at 9.

Craig Duke became fire chief on March 20, 2017. *Id.* at 10. Bermudez requested a meeting with Duke about Martin. *Id.* Bermudez alleges that Duke was demeaning, belittling, and condescending at the meeting. *Id.* An HR representative asked Bermudez if she wanted to make a written complaint, but Bermudez did not. *Id.* at 10-11. Bermudez contends that a written complaint was not necessary and that the HR representative should have investigated her complaint about Duke anyway. Doc. 56 at 8-9.

In September 2017, the TFD acquired new self-contained breathing equipment ("Airpack"), which required training for all TFD employees. Doc. 48 at 13. The Airpack training consisted of a classroom segment and an outside "confidence course" in full firefighting gear. *Id.* Bermudez and another female fire inspector, Michelle Conway, asked to be excused from the confidence course. Conway had a medical condition, and Bermudez asked because she had not been provided suppression training in her 18 years as a fire inspector. *Id.* Although Bermudez thought she could have completed the confidence course, she felt she should not have to do it

because she was not given time to exercise during the work day since she became an inspector. Doc. 48 at 13; Doc. 56 at 11-12.[1]

At the Airpack training, the training chief told Bermudez and Conway they could observe rather than participate in the confidence course. Doc. 48 at 14. But he did not immediately tell the training officers that Bermudez and Conway were excused, which Bermudez believed amounted to "setting them up." *Id.* After Conway told some other firefighters at the training that she was just observing the confidence course, one of the training officers made a "huff" noise. *Id.* Conway then asked if anyone had a problem with her not doing the training, and someone responded "yeah, you guys should be doing this and consider this your training." *Id.* at 14-15. Conway then left the training and Bermudez went with her. *Id.* at 15. Bermudez did not hear any comments made to Conway, but Conway told her about them later. *Id.* Bermudez was later told that someone said they should consider this their training, and another person said that "if you are not going to do this training, you can consider yourself an Inspector and not a Fire Inspector." *Id.* After Bermudez and Conway told the training chief that other firefighters had disagreed with their non-participation, the training chief offered to tell the others that Bermudez and Conway were excused. *Id*. Bermudez was not disciplined for not completing the Airpack confidence course. *Id.* An HR representative later investigated the comment made to Conway but found no violation of City policy. *Id.* at 15-16.

Martin completed the Airpack training. *Id.* at 16. Martin posted on the TFD's Twitter account a picture of himself wearing a tie and the Airpack equipment, and captioned it, "No one

---

[1] The City contends that only suppression employees, who work 24-hour shifts, are allowed to work out while on the clock. Specialty or prevention employees, who work a traditional 8-to-5 workday, are not. Doc. 48 at 13. Bermudez controverts this by stating that she does not know if other specialty employees were allowed to work out on the clock, and that she believes the TFD should have permitted her to maintain minimum suppression skills in accordance with her job description. Doc. 56 at 10-11. But she does not point to any evidence that similarly situated male specialty or prevention employees were allowed to work out on the clock while she was not.

is immune from training on the new air packs #TrainingInATie." *Id.* The tweet came at least a week after Bermudez and Conway attended the Airpack training. *See* Doc. 56 at 26; Doc. 57 at 30. Martin testified that his intent was to make fun of himself for having done the Airpack training while wearing a tie, and that the statement "no one is immune" was meant to refer to him being on senior TFD staff. He testified he was not thinking about Bermudez or Conway. Doc. 48 at 16. Bermudez believes that the tweet was directed at her and Conway because it said no one was immune from training, and they did not do the training. Doc. 56 at 13. HR investigated the tweet and found no violation of City policy. Doc. 48 at 16.

On December 1, 2017, Bermudez submitted a resignation letter, citing intolerable working conditions. *Id.* at 18. On December 4, 2017, Bermudez was put on paid administrative leave for the rest of her two-week notice period so that she could be paid but not have to face working conditions she deemed intolerable. *Id.* at 18-19. Although she had resigned due to "intolerable" working conditions, Bermudez considered it unfair that she did not get to "finish contacts she had made with people and inspections." *Id.* at 19.

Bermudez later filed an EEOC complaint on April 9, 2018. *Id.* Three hundred days before Bermudez's EEOC complaint is June 14, 2017. Doc. 46 at 2 (stipulation of the parties).

## II. STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a

light most favorable to the nonmoving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. ANALYSIS

Bermudez originally alleged both gender discrimination and retaliation under Title VII and KAAD in her petition. Doc. 1 at 9-12.[2] In the pretrial order, Bermudez listed six legal claims that ostensibly covered gender discrimination and gender-based hostile work environment under Title VII and KAAD,[3] as well as retaliation, retaliatory harassment, and constructive discharge. Doc. 46 at 10.

### A. Gender Discrimination and Gender-Based Hostile Work Environment

The City moves for summary judgment on Bermudez's gender-based claims. Doc. 48 at 21-35. Bermudez has not responded to these arguments. She only argues that she has shown a triable case of retaliatory harassment. Doc. 56 at 29-44. Bermudez's failure to respond to the City's arguments about her gender-based claims suggests she has abandoned those claims and is grounds for summary judgment. *See, e.g.*, *Maestas v. Segura*, 416 F.3d 1182, 1190 n.9 (10th Cir. 2005) (finding that plaintiffs abandoned claims by failing to "seriously address them" in their appellate brief); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768-69 (10th Cir. 2001) (affirming district court's ruling that plaintiff abandoned claim by failing to address it in response to a motion

---

[2] The City removed this case from state court. *See generally* Doc. 1.

[3] Neither party specifically addresses any of Bermudez's claims under KAAD, focusing instead on Title VII standards. But the standards for KAAD claims are the same as they are for claims under Title VII. *Dean v. Boeing Co.*, 260 F. App'x 124, 128 (10th Cir. 2008); *Lewis v. Standard Motor Prod., Inc.*, 203 F. Supp. 2d 1228, 1233 n. 13 (D. Kan. 2002). Accordingly, to the extent a claim fails under Title VII, it also fails under KAAD.

7

for summary judgment). Accordingly, the Court grants the City summary judgment on Bermudez's gender-based claims.

B.  **Retaliatory Harassment**

In response to the City's motion, Bermudez only argues that she suffered retaliatory harassment. She does not argue any discrete acts of retaliation.[4] Bermudez contends the actions dating back to 2014 amount to a continuing stream of retaliatory harassment and that all of those actions should be considered in evaluating whether she has presented a viable claim for submission to a jury. Doc. 56 at 44-46. The City argues that actions or events that fall outside the 300-day period—anything before June 14, 2017—are time barred and should not be considered. Doc. 48 at 39-41.

"In states with a state agency that has authority over employment discrimination claims, including Kansas, employees have up to 300 days to file an EEOC charge if they first file a charge with the state agency." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012). This requirement exists because "Title VII is not intended to allow employees to dredge up old grievances." *Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005). "Unlitigated bygones are bygones." *Id.* Claims that fall outside the 300 days are therefore time barred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Discrete claims of discrimination or retaliation occur on the day the act happened, and that must fall within the 300-day period to be actionable. *Id.* at 110-13.[5] But "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one

---

[4] Although there is some confusion regarding whether retaliatory harassment is a theory of retaliation or an entirely separate claim, the Court treats it as a separate claim in this case and notes that other courts in the District of Kansas have previously recognized retaliatory-harassment claims. *See, e.g., Turrentine v. United Parcel Serv., Inc.*, 645 F. Supp. 2d 976, 986 (D. Kan. 2009); *Haney v. Preston*, 2010 WL 5392670, at *12 (D. Kan. Dec. 22, 2010); *Adcox v. Brennan*, 2017 WL 2405326, at *6 (D. Kan. June 2, 2017).

[5] As noted above, Bermudez does not argue that she suffered any actionable <u>discrete</u> acts of retaliation.

'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Accordingly, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the <u>same unlawful employment practice</u> and at least one act falls within the time period." *Id.* at 122 (emphasis added).[6] In other words, there must be a related series of events, and at least one of those events must fall within the 300-day period before the plaintiff filed her EEOC complaint. *See Duncan*, 39 F.3d at 1309-10.[7]

Here, Bermudez filed her EEOC complaint on April 9, 2018. Doc. 46 at 2. Three hundred days before that date is June 14, 2017. *Id.* Accordingly, to assert a timely claim of retaliatory harassment, Bermudez must identify harassment that occurred after June 14, 2017. Any acts of harassment that occurred before June 14, 2017, must be sufficiently related to actions after that date to be considered in evaluating the overall claim. Thus, the Court will first determine whether pre-June 14, 2017 events are sufficiently related to post-June 14, 2017 events to be considered part of the same employment practice. Once the scope of the claim is determined, the Court will then evaluate the merits of Bermudez's retaliatory-harassment claim based on the actions that are not time-barred. *See Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1140 (10th Cir. 2008); *Duncan*, 397 F.3d at 1309.

1. **Relatedness of Pre-June 14, 2017 Events to Post-June 14, 2017 Events**

"To determine whether these acts are part of the same hostile work environment, *Morgan* advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts." *Duncan*, 397 F.3d at 1309. Although uniformity of "type, frequency, and perpetrator" is not a "per

---

[6] "Harassment" and "hostile work environment" are frequently used interchangeably in the Title VII context, especially in cases of retaliation. *See Adcox*, 2017 WL 2405326, at *6 (equating the terms in noting that "retaliatory harassment" is a viable claim in the Tenth Circuit even though a "hostile work environment claim based on retaliation" has never been formally recognized).

[7] This so-called "continuing violation doctrine" applies only to hostile-work-environment claims, not discrete claims. *Daniels*, 701 F.3d at 632.

se requirement," the acts must be "sufficiently related to constitute the same employment practice." *Tademy*, 614 F.3d at 1140, 1143.

Only the Airpack training incident and tweet that occurred in September 2017 fall within the 300-day period preceding Bermudez's EEOC complaint. The Court concludes that no reasonable jury could find that the events outside the 300-day period bear any relationship to the September 2017 Airpack training and tweet. All of the earlier incidents involve management decisions and actions by Martin regarding Bermudez's day-to-day work, including the conduct in 2014 and the investigation into the complaints against Bermudez in early 2017. By contrast, the Airpack training incident did not even involve Martin, or, for that matter, Bermudez. Bermudez alleges the training chief excused her from training (at her request). Other unidentified firefighters then made some remarks <u>to Conway</u>, which Bermudez only heard about later. Unknown firefighters making comments to Conway bears no relationship to any of the unrelated management decisions—retaliatory or otherwise—that Martin took towards Bermudez months or years earlier.

At least a week later, the TFD's Twitter account featured a picture of Martin in a tie wearing an Airpack, with the caption that "No one is immune from training on the new air packs #TrainingInATie." Even accepting Bermudez's assumption that the tweet was directed at her—even though it did not reference her at all—the tweet is of a qualitatively different nature than any of the 2014 or early 2017 conduct she complains of. In sum, no reasonable jury could find that the Airpack training and tweet in September 2017 bear any relationship to the conduct that occurred outside the 300 days.[8] Accordingly, the Court finds that the Airpack training incident and tweet

---

[8] Bermudez's reliance on *Quidachay v. Kansas Department of Corrections* is not persuasive. The issue there was whether certain outdated actions could be used to demonstrate a causal link between protected activity and the many subsequent failures to hire the plaintiff. 239 F. Supp. 3d 1291, 1295-96 (D. Kan. 2017). This analysis is inapposite to the question here of whether the actions complained of by Bermudez outside the 300-day period are

were not a continuation of retaliatory harassment that began in 2014. All incidents from before June 14, 2017, are therefore not timely.[9]

### 1. Merits of Timely Retaliatory-Harassment Claim

Because the only events that fall within the 300-day period are those that occurred in September 2017, those are the only events properly considered in evaluating Bermudez's retaliatory-harassment claim. *Tademy*, 614 F.3d at 1140; *Duncan*, 397 F.3d at 1309.[10] To establish a prima facie case of retaliatory harassment, a plaintiff must show: "(1) she engaged in protected opposition to discrimination; (2) defendant subjected her to conduct that might well have dissuaded a reasonable employee from making a charge of discrimination; and (3) a causal nexus exists between plaintiff's opposition and defendant's conduct." *Haney*, 2010 WL 5392670, at *12. Regarding the second element, the traditional hostile-work-environment concepts of "severe" or "pervasive" still apply in a retaliatory-harassment claim. *Adcox*, 2017 WL 2405326, at *7. Specifically, "the conduct must be sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity." *Id.*[11]

---

    sufficiently related to those within that period. *Quidachay* was also in the context of a Rule 12 motion to dismiss, not summary judgment, and the court still noted that the allegations there were "extremely thin," though ultimately sufficient at that stage of the case. *Id.* Bermudez's argument that the actions outside the 300-day period should be considered even if they "were not all part of the same indivisible hostile work environment" because they somehow link her current lawsuit to her 2014 EEOC complaint, *see* Doc. 56 at 46, undercuts the Supreme Court's holding in *Morgan* that actionable conduct must be part of the same unlawful employment practice and would skirt the Title VII time limit altogether.

[9] The City also moved for partial summary judgment as to certain 2014 incidents that were not listed in Bermudez's EEOC complaint. Doc. 48 at 41-42. Because the Court finds that all actions other than those in September 2017 are not timely, it need not reach this argument.

[10] The City includes a factual allegation that Duke saw Bermudez's out-of-date fire boots at the Airpack training and said they were "like antiques" before arranging for her to receive new boots. Doc. 48 at 13. Bermudez does not argue in response to summary judgment that this event is part of her retaliatory-harassment claim. Even if she did, the Court finds it would fail for the same reasons the other events in September 2017 fail to state an actionable harassment claim.

[11] Bermudez disputes that "severe or pervasive" is an element of a retaliatory-harassment claim, citing *Furr v. Ridgewood Surgery & Endoscopy Ctr.* and *Turrentine v. U.P.S., Inc.* Doc. 56 at 30. In *Furr*, the court relied on *Turrentine* to adopt Judge John W. Lungstrum's conclusion "that a plaintiff claiming retaliatory harassment need not show harassment that is severe or pervasive, but must only show that the challenged conduct might dissuade a

Bermudez's claim falls far short of meeting that standard. The Airpack training incident involved Bermudez asking to be excused from the confidence course, the training chief excusing her, and someone else then making some mild comments to Conway.[12] Within a week or two, the TFD Twitter account posted a picture of Martin with the caption, "No one is immune from training." But the tweet featured Martin and did not mention Bermudez. The Court finds that this conduct, even when considered collectively, is not sufficiently severe or pervasive that it would dissuade a reasonable worker from engaging in protected activity. *See Adcox*, 2017 WL 2405326, at *7.[13] Both incidents were very tame and neither was even outwardly directed at Bermudez. A remark that someone should do firefighter training to consider themselves a fire inspector and then tweeting that no one is immune from training is, at worst, rude or mildly passive aggressive. But it does not objectively rise to the level of conduct that would dissuade a reasonable employee from engaging in protected conduct. *See id.* at *8 n.10.[14] It is well established that Title VII is not "a

---

    reasonable person from pursuing a charge." *Furr v. Ridgewood Surgery & Endoscopy Ctr.*, 192 F. Supp. 3d 1230, 1249 (D. Kan. 2016). But in *Adcox*, Judge Lungstrum clarified *Turrentine* and concluded that "severe or pervasive" must still be part of the analysis. *Adcox*, 2017 WL 2405326, at *7. The Court agrees.

[12] Bermudez was not within earshot of the comments made to Conway. Doc. 48 at 15. Those comments arguably should not even be considered as part of Bermudez's retaliatory-harassment claim because it was not Bermudez being harassed.

[13] Bermudez only analyzes this claim by including all the incidents going back to 2014, before summarily concluding that all the actions, when considered collectively, "might well dissuade a reasonable employee from making additional complaints." Doc. 56 at 38. This conclusory analysis is not persuasive. Further, although Bermudez does not assert any discrete claims of retaliation, the Court notes that, by finding all the pre-June 2017 incidents to be time-barred, Bermudez's retaliatory-harassment claim has essentially been reduced to the Airpack training and the tweet. As discussed above, these incidents are not "sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity" for purposes of a retaliatory-harassment claim. *See Adcox*, 2017 WL 2405326, at *7. The Court notes that a discrete retaliation claim is analyzed under a similar standard. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233-34 (10th Cir. 2015) (stating that a retaliation claim requires a materially adverse action, which is one that would dissuade a plaintiff from making a charge of discrimination). Accordingly, to the extent Bermudez challenges the Airpack training incident and tweet as discrete claims of retaliation, they would likewise fail, and the City would be entitled to summary judgment.

[14] Bermudez also argues that she can meet the causal-connection based on temporal proximity alone. Doc. 56 at 38-39. But the Court is doubtful. Bermudez's only prior EEOC activity before this case was in 2014. But she claims to have engaged in additional protected activity by submitting the response to her February 2017 evaluation. As noted above, that response did not specifically allege gender discrimination, though it did generally reference opposition to nepotism and cronyism. Even if the Court considers that to be protected activity, it is far outside the window of time that can create a causal link to the comments made at the Airpack training or the tweet. *See Hysten*

general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Nor is it the Court's role "to mandate that certain individuals work on their interpersonal skills and cease engaging in inter-departmental personality conflicts." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1218 (10th Cir. 2008). "[P]etty slights, minor annoyances, and simple lack of good manners" do not deter employees from pursuing their rights under Title VII. *White*, 548 U.S. at 68. Even construing all inferences in Bermudez's favor, the actionable conduct she complains of falls into the category of petty slights, and no reasonable jury could find otherwise. Accordingly, the Court finds that no reasonable jury could find for Bermudez on her claim of retaliatory harassment.

B.      **Constructive Discharge**

Finally, the City moves for summary judgment on Bermudez's constructive-discharge claim. The City argues that Bermudez voluntarily resigned and was not forced to quit because of intolerable working conditions. Doc. 48 at 37-39. Although Bermudez asserts in the introduction to her response that she was forced to resign and suffered economic damages, she does not otherwise substantively address the City's argument that she cannot sustain a claim for constructive discharge.[15]

---

*v. Burlington N. Santa Fe Ry. Co.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002) (noting that a three-month period between the protected conduct and termination is not sufficient to raise an inference of retaliation). The parties also dispute whether the complaint about the comments at the Airpack training was by Conway or Bermudez. But even if Bermudez was the one who complained, and even if that was construed as protected activity, the fact that the tweet came a week or two later is not enough to raise a causal link based on temporal proximity alone, especially where there are no allegations that Martin was even aware that Bermudez complained about the Airpack training incident.

[15]   Indeed, the pretrial order notes that Bermudez seeks <u>only</u> economic damages in the form of lost pay, benefits, and retirement, and that she does not seek any non-economic damages. Doc. 46 and 12 n.2. Nevertheless, she fails to counter the City's argument that she cannot establish constructive discharge.

Bermudez's failure to respond to the City's arguments about her alleged constructive discharge again suggests she has abandoned that claim and is grounds for summary judgment. *See, e.g.*, *Maestas*, 416 F.3d at 1190 n.9; *Hinsdale*, 19 F. App'x at 768-69. But even if Bermudez had addressed it, the Court would still find no grounds to submit a claim for constructive discharge to a jury, given the above finding that Bermudez has failed to show a prima facie case of retaliatory harassment. It is a plaintiff's burden in a constructive-discharge case to demonstrate that discrimination in the workplace "made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007) (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004)). It is an objective standard. *Id*. The conduct Bermudez complains of falls well below that standard. Specifically, Bermudez has failed to point to conduct that would dissuade a reasonable employee from engaging in protected activity, let alone conduct that would compel a reasonable person to resign. Further, the last incident complained of occurred in September 2017. Bermudez then waited another two months before resigning, and then gave two-weeks notice. That belies any claim that she was suffering an intolerable work environment. *See Cappell v. Dep't of Army*, 2014 WL 5782389, at *8 (D. Kan. Nov. 6, 2014). Accordingly, the City is entitled to summary judgment on Bermudez's constructive-discharge claim.

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that the City's Motion for Summary Judgment (Doc. 47) is GRANTED. Judgment is to be entered for the City.

IT IS SO ORDERED.

Dated: January 14, 2020        /s/ *Holly L. Teeter*
                               HOLLY L. TEETER
                               UNITED STATES DISTRICT JUDGE